IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LOUISE WINSTON o/b/o ) | |
| EDWARD WINSTON (deceased), ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 12-00298-N |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

ORDER

Plaintiff Louise Winston ("Winston") filed this action on behalf of her deceased husband, Edward Winston, seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that he was not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-433, or to Supplemental Security Income benefits (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c. Pursuant to the consent of the parties (doc. 18), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. *See* Doc. 20. The parties waived oral arguments and requested that the action be decided on the pleadings. *See* Doc. 19. Upon consideration of the administrative record

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is to be substituted for Michael J. Astrue as the defendant in this suit. *See*, 42 U.S.C. § 405(g).

(doc. 14), and the parties' respective briefs (docs. 15 and 16), the undersigned finds that the decision of the Commissioner is due to be **AFFIRMED.**

I. Procedural History.

On June 25, 2009, Winston filed a Title II application for disability insurance benefits (DIB) and a Title XVI application for Supplemental Security Income benefits (SSI). (Tr. 13). Winston claimed an onset of disability as of December 31, 2002. (Tr. 13). He alleged an inability to work based upon the following impairments: degenerative disc disease of the cervical spine, osteoarthritis of the knees, depression, acute hepatitis C, adjustment disorder, and a history of substance abuse disorder (Tr. 15). He was insured for purposes of disability benefits only until March 31, 2007 (Tr. 113). The application was initially denied on September 11, 2009 (Tr. 13, 54) and, on November 10, 2009, Winston requested a hearing (Tr. 63-64) before an Administrative Law Judge ("ALJ")[2]. On June 19, 2010, Edward Winston died from an accidental neck injury before his hearing could commence (Tr. 109-112). On July 29, 2010, Louise Winston, as Edward's widow, became a substitute party (Tr. 13, 35). Following a hearing on December 16, 2010, (Tr. 30-52), the ALJ issued an unfavorable decision on January 7, 2011 (Tr. 13-26). Louise Winston requested a review by the Appeals Council (Tr. 7) that was subsequently denied on March 19, 2012 (Tr. 1-3), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009). Louise

---

[2] Claimant's application was processed pursuant to 20 C.F.R. § 404.906(b)(4), whereby after the initial determination, the reconsideration step in the administrative review process was eliminated, and the claimant could immediately request an administrative hearing. All references to the C.F.R. (Cod of Federal Regulations) are to the 2012 edition of part 404, which addresses claims under Title II of the Act. All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

Winston, on behalf of Edward Winston, has exhausted all his administrative remedies and now appeals from that final decision.

II. Issues on Appeal.

1. Whether the ALJ erred by finding that Edward Winston could perform the exertional demands of light work given the evidence of record that he required "an assistive device," namely "a cane."

2. Whether the ALJ erred by failing to consider or even mention Edward Winston's obesity or its effects on his medical impairments, as required by SSR 02-01p.

III. Standard of Review.

A. Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth

v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

The ALJ is responsible for determining a claimant's RFC, an ingrained principle of Social Security law. *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative law judge hearing level under § 416.1429 or at the Appeals Council review level under § 416.1467, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity.") "Residual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." Peeler v. Astrue, 400 Fed.Appx. 492, 493 n. 2 (11th Cir. Oct.15, 2010), *citing* 20 C.F.R. § 416.945(a). *See also,* Hanna v. Astrue, 395 Fed.Appx. 634, 635 (11th Cir. Sept.9, 2010) ("A claimant's RFC is 'that which [the claimant] is still able to do despite the limitations

4

caused by his ... impairments.'")(*quoting* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004). "In making an RFC determination, the ALJ must consider all the record evidence, including evidence of non-severe impairments." Hanna, 395 Fed.Appx. at 635 (citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence."). The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] ... use[s] to make a[n][RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary," and helping the claimant get medical reports from her own medical sources. 20 C.F.R. § 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from her impairments, "including limitations that result from [ ] symptoms, such as pain[.]" *Id*.

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. § 416.945(a)(4).

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural

functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

(c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

(d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. § 416.945(b), (c) & (d). *See also* Kennedy v. Astrue, 2012 WL 2873683, * 7-8 (S.D. Ala. July 13, 2012).

B. Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See*

42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?
(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). *Id.* at 1239–40.

Additionally, to qualify for a period of disability and/or disability insurance benefits, plaintiff must prove he has a medically determinable impairment or impairments of sufficient severity to constitute a disability as contemplated by the Act and that the impairment or impairments became disabling while he was insured for disability purposes. The Act places the burden of establishing disability on the plaintiff. Bloodsworth v. Heckler, 703 F.2d 1233, 1240 (11th Cir. 1983); *see also* 42 U.S.C. §S 423(c)(1); 20 C.F.R. § 404.1512(a). In order to receive disability insurance benefits or a period of disability, Winston must establish that his condition became disabling before the expiration of his insured status on March 31, 2007. Ware v. Schweiker, 651 F.2d 408, 411 (5th Cir. 1981), *cert. denied*, 455 U.S. 912 (1982) (Claimant "must show that she was disabled on or before the last day of her insured status."). If a plaintiff becomes disabled after insured status has expired, the claim must be denied despite disability. *See*, Kirkland v. Weinberger, 480 F.2d 46 (5th Cir. 1973); Chance v. Califano, 574 F.2d 274 (5th Cir. 1978); Morgan v. Astrue, 2008 WL 4613060, * 13 (S.D. Fla. Oct. 15, 2008)("If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied, despite her disability."); Benjamin v. Apfel, 2000 WL 1375287, * 3 (S.D. Ala. August 02, 2000)(" If a claimant becomes disabled after her insured status has expired, her claim must be denied despite her disability.") Winston's earnings record shows he was insured through March 31, 2007, but not thereafter (Tr. 113). Winston must establish that his condition reached a disabling level of severity between

9

his alleged onset date of December 31, 2002, and his date last insured of March 31, 2007, for eligibility for Title II disability insurance benefits.

IV. Relevant Facts.

1. Winston's vocational background.

Winston was born on September 16, 1952. (Tr. 105). He was 50 years old on December 31, 2002, the date he contends his disability began and was not yet 58 years old at the time of his death. Winston was insured for the purposes of disability benefits until March 31, 2007 (Tr. 40, 113). He finished high school, was able to read and write, and served in the military (Air Force) (Tr. 40-41). Winston last worked on December 31, 2002 as a ship fitter (Tr. 41). He worked at that job "off and on [] his whole life" (Tr. 41). When he was not working, he kept himself occupied sitting up, watching TV and playing with five grandchildren (Tr. 43). Sometimes he would cut the grass (Tr. 43). He was able to drive and did go to church (Tr. 43). He also like to fish and loved football (Tr. 44). During the relevant period of December 31, 2002 (the date of disability onset) to March 31, 2007 (the date he last met the insured status), he was working on staying sober but would slip sometimes and then stop again (Tr. 45).

2. Medical Evidence.

The only medical evidence relied on by Winston as support for his contention that the ALJ improperly disregarded his obesity is as follows"

> On January 14, 2004, Mr. Winston presented to Dr. Harrow at the MOPC complaining of poor appetite and lack of energy although his weight was up eleven [pounds] (Tr. 226). It was assessed that Mr. Winston had weight gain and was obese (Tr. 227). The doctor discussed with Mr. Winston that if no medical cause was found that affective disorder was likely (Tr. 227).

10

On February 26, 2004, Mr. Winston presented to Dr. Spiro for a follow up on sleep problems (Tr. 222). During this visit it was documented that Mr. Winston's weight was 271.1 lbs with a height measuring 71 inches and a body mass index of 37.9 [Tr. 219].

On April 23, 2004, Mr. Winston presented to Dr. Nathanial Abston for a psychological consultation [Tr. 215]. At this consultation it was noted that Mr. Winston reported weight gain of over 20 pounds the past year as well as little energy and chronic pain all over his body which is keeping him from maintaining gainful employment [Tr. 215]. Dr. Abston diagnosed Mr. Winston with Mood Disorder, secondary to chronic pain, hepatitis C, arthritis, and noted a GAF of 50 [Tr. 215].

On November 24, 2006, the Biloxi VAMC recorded Mr. Winston's weight at 283.60 lbs, height at 71 inches and body mass index at 40 [Tr. 267]. Also, on July 1, 2009, the same facility recorded Mr. Winston's weight at 276.00 lbs, height at 71 inches and body mass index at 39 [Tr. 266]. Thus evidencing a body mass index surpassing 30 and even attaining 40 throughout the years 2004 to 2009.

(Doc. 15 at 3-4). With respect to the issue concerning Winston's use of a cane, he relies solely on the following summary of the medical evidence:

On April 7, 2008, Mr. William Reasor, NP, requested an adjustable cane with an urgency listed as emergency (Tr. 329). The request came after a provisional diagnosis of impairment of knee (Tr. 329). Furthermore, just a couple days later on April 9, 2008, a large thermaphore heating pad was ordered upon a provisional diagnosis of Lumbago (Tr. 328).

(Doc. 15 at 4).

A review of the evidence surrounding these limited office visits of Winston reveals that at no time did any physician set forth a diagnosis of obesity. On January 14, 2004, the physician's assessment was merely "alert, oriented, ambulatory" (Tr. 227). Although the physician's did report that he "discussed if no medical cause found that affective disorder likely," this discussion clearly related to Winston's "anorexia w/

11

weight gain" and not to any diagnosis of obesity (Tr. 224). Similarly, although "sleep problems" were noted (Tr. 220) in the records relating to Winston's visit to Dr. Arthur W. Spiro on February 26, 2004, the records indicate that this visit was requested by Winston on January 23, 2004 based on his "lack of energy and appetite"(Tr. 223). Additionally, no diagnosis of obesity was made in the medical records related to the February 26, 2004 visit to Dr. Spiro (Tr. 219-222).

On April 23, 2004, Winston was seen by Nathanial Abston, Jr., Ph.D., in consultation to determine "his suitability for psychotherapy" (Tr. 215). At this consultation, it was Winston who reported that he had "gained over 20 pounds the past year and that his body aches/hurts all over [and] he is not able to maintain gainful employment due to the pain" (Tr. 215). Dr. Abston made no diagnosis relative to Winston's weight gain and merely noted that he was "unemployed" (Tr. 215). Nor did he explain his diagnosis of GAF-50 beyond reporting the following observations:

> Patient is alert and oriented and fairly well groomed. His affect is constricted and he describes his mood as "OK". He denies current S/H ideas, substance abuse, or the need for hospitalization. Speech and stream of thought are coherent, relevant and goal-directed. There is no evidence of delusions and he denies hallucinations. Intelligence is estimated to be in the average range and attention and concentration are adequate. Memory functions are intact for recent and remote events. His insight and judgment appear adequate.

(Tr. 215).[4]

---

[4] The Global Assessment of Functioning (GAF) Scale describes the overall psychological, social, and occupational functioning resulting from mental illness, but without inclusion of any impaired functioning caused by physical or environmental limitations. Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed.1994, at 32. The Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listing." *See*

12

The medical records do include notations regarding Winston's weight and body mass index on "Vitals" sheet dated November 24, 2006 (Tr. 267) and July 1, 2009 (Tr. 266), as reported by Winston. However, the progress notes indicate that, on November 21, 2006, Winston presented to the emergency room of Biloxi VAMC with cholelithiasis[5] (Tr. 656, 651), and ultimately underwent a cholecystectomy (removal of the gallbladder) on November 24, 2006 (Tr. 646). He was discharged home on November 28, 2006 (Tr. 582). Throughout all of the medical records associated with this hospitalization (Tr. 579-657, the only notations related to Winston's weight were made by a "Diet Technician" who discussed her instructions to the patient about nutrition for weight reduction and encouraging daily exercise (Tr. 594-595).[6] Even more relevant is the fact that there is no evidence in any of the medical records that Winston's weight interfered with any activity of daily living or capacity to work, either by itself or in combination with any other medical impairment. Nor has either Edward or Louise Winston ever made a claim to that effect.

The prescription for a cane relied on by Winston was pursuant to a particular goal established under the Master Treatment Plan developed by Mary Romano, a social worker, for the five-week program he was admitted to on April 1, 2008 for treatment of

---

Nye v. Commissioner of Social Sec., 2013 WL 3869964, * 4 (11th Cir. July 26, 2013)(" the Commissioner has noted that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings."), *quoting* 65 Fed.Reg. 50746, 50764–65 (Aug. 21, 2000).

[5] Cholelithiasis is the medical term for gallstone disease or a gallbladder filled with gallstones. http://emedicine.medscape.com/article/175667-overview.

[6] The progress notes related to Winston's July 1, 2009 clinic visit indicates that, not only was it unrelated to any condition existing prior to his last insured date of March 31, 2007, but it was merely a follow-up appointment because he needed "medical clearance for [a] dental procedure" (Tr.365).

his Cocaine and Alcohol Dependence (Tr. 486). Winston's Problem # 3 was entitled "Medical Management and Assistance" and identified the following manifestations: Obesity, Sleep Apnea, Chronic Pain (knee/lower back), and Hepatitis C (Tr. 487). The Master Plan set forth the following goals and objectives:

> Goals:
> To see Prosthetics for cane. To see prosthetics for sleep apnea replacement mask. To see Physical Therapy for heating pad. To see Kinesiotherapy for cane. To have EKG for admission. To take medications as prescribed. To be seen by PRRTP Medical Staff as needed for acute or chronic problems. To be seen by Diet Technician for nutritional plan. To walk daily as tolerated for general health promotion. To use cane for ambulation.
>
> Objective:
> The patient will attend two-of-two Prosthetic Clinic appointments as scheduled. The patient will attend one-of-one Physical Therapy Clinic appointment as scheduled. The patient will attend one-of-one Kinesiotherapy Clinic appointment as scheduled. The patient will attend one-of-one EKG Clinic appointment as scheduled. The patient will take medications as prescribed. The patient will attend one-of-one Diet Technician appointment as scheduled. The patient will walk daily as tolerated. The patient will see PRRTP Medical Staff as scheduled/needed. The patient will use cane for ambulation.

(Tr. 487). With respect to the cane and the heating pad, as well as the c-pap mask, the "urgency" with which the orders were placed was designated as "routine" (Tr. 329, 330, 331) not "emergency" as contended by Winston (doc. 15 at 4). The records associated with these prescriptions do not constitute evidence of the existence of any disabling impairment before March 31, 2007, the date on which Winston was last insured.

    3.    <u>Vocational Expert's Testimony</u>.

Jody Skinner, the Vocational Expert (VE), was called to testify by the ALJ regarding Winston's past relevant work as a ship fitter. (Tr. 47). He concluded that the

work is heavy and skilled with an SVP of 8. (Tr. 47).  Ms. Skinner was then presented with a hypothetical of a man Winston's age, education and work background who was limited to lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, no overhead reaching, and no climbing ladders, scaffolds or ropes; and no work around unprotected heights or dangerous equipment; occasional crouching or squatting; no kneeling, crawling; occasional climbing stairs and ramps; and no more than occasionally operating foot controls; avoid complex and detailed constrictions, but can perform short, simple instructions and one and two step job instructions (Tr. 47-48).

Ms. Skinner testified that such an individual could perform the following unskilled jobs: information clerk (DOT 237.367-018) which is light, unskilled with an SVP level of two and about 287,000 jobs available nationally and 12,000 available statewide; self service station attendant, cashier (DOT 211.462-010) which is light, unskilled with an SVP level of two and about 1,736,000 jobs available nationally and 59,000 available statewide; assembler (DOT 706.684-022) which is light, unskilled with an SVP level of two and about 496,000 jobs available nationally and 16,000 available statewide (Tr. 48, 50).

A second hypothetical was presented in which the ALJ added "a restriction on standing and walking such that [the] individual cannot stand or walk for longer than . . . a half hour at a time [and] then would have to change positions . . . throughout the workday [with] no restrictions on sitting" (Tr. 49). Ms. Skinner testified that there would exist no jobs for such an individual, including the production assembler and information clerk identified previously as well as a garment bagger (DOT 920.687-018) which is light and

15

unskilled and about 418,000 jobs available nationally and 12,000 available statewide (Tr. 49-50).[7]

5. ALJ's Decision.

The ALJ found at step two that Winston's degenerative disc disease of the cervical spine, osteoarthritis of the knees, depression, acute hepatitis C, adjustment disorder, and history of substance abuse disorder were severe impairments (Tr. 15, Finding 3), but determined at step three that Plaintiff had not met his burden to show that his impairments or combination of impairments "meets or medically equals one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1." (Tr. 16, Finding 4).

V. Analysis.

1. **The ALJ did not err by finding that Edward Winston had the residual functional capacity to perform the exertional demands of light work because there was no evidence that he needed a cane during the relevant time period.**

The only aspect of the ALJ's residual functional capacity challenged by Winston is her failure to include a requirement that he use an assistance device, namely a cane (Doc. 15 at 7). Winston acknowledges, however, that the "[n]ecessity of a hand-held assistance device . . . was prescribed on April 9, 2008." (Doc. 15 at 8). This was over a year after his insured status of March 31, 2007, had expired.

In order to qualify for a period of disability and/or disability insurance benefits, Winston bore the burden to prove he had a medically determinable impairment or

---

[7] Ms. Skinner testified that no work existed for someone who would be unable to meet routine attendance and production requirements more than occasionally during a work month (Tr. 50).

16

impairments which became disabling while he was insured for disability purposes. Bloodsworth, *supra* 703 F.2d at 1240; *see also* 42 U.S.C. §S 423(c)(1); 20 C.F.R. § 404.1512(a). Consequently, it was Winston's burden to establish that his condition became disabling before the expiration of her insured status on March 31, 2007. Ware, *supra* 651 F.2d at 411 (Claimant "must show that she was disabled on or before the last day of her insured status."). Inasmuch as Winston was not required to use a cane prior to April 9, 2008, which was after his insured status had expired, his claim must be denied even if disability could have been established based on the required use of the cane. *See e.g.*, Benjamin, *supra* 2000 WL 1375287, * 3 (S.D. Ala. August 02, 2000)(" If a claimant becomes disabled after her insured status has expired, her claim must be denied despite her disability.").

### 2. The ALJ did not err by failing to consider or even mention Winston's obesity or its effects on his medical impairments.

Winston argues, in sum, that the ALJ was required by SSR 02-01p "to take the claimant's obesity into account and its affect on claimant's medical impairments." (Doc. 15 at 9). In support of this proposition, Winston cites Thomason v. Barnhard, 344 F.Supp.2d 1326, 1330 (N.D. Ala. 2004). However, this opinion is inapposite because the discussion regarding the possible impact of obesity on an individual's ability to perform work activities was only one factor of six which constituted the court's grounds for reversal and the decision contains no meaningful recitation of the facts or medical evidence in the case. The Thomason court also reversed on the grounds that "[t]here is no evidence plaintiff can perform medium work [because] [t]here is no formal assessment

17

of record of plaintiff's Residual Functional Capacity [RFC] either by examining or non-examining physicians addressing plaintiff's ability to perform work activities." 344 F.Supp2d. at 1329.

In this case, none of the notations in Winston's medical records concerning his weight are associated with any complaint from which it could be inferred that his weight had any impact on his ability to perform any activity of daily living or capacity to work. Nor have either Edward or Louise Winston ever claimed that his weight presented any such problem. *See* Biesty v. Astrue, 2011 WL 4424442, at *4 (M.D. Fla., Sep. 22, 2011) ("[T] there is no error requiring reversal given that Plaintiff never alleged that his weight or obesity affected his ability to work and he fails to demonstrate that his obesity imposed additional limitations on his ability to work beyond those determined by the ALJ."). *See also* James v. Barnhart, 177 Fed. App'x. 875, 878 n.2 (11th Cir. 2006)(The ALJ did not err by failing to find obesity was a severe impairment because plaintiff, during her own testimony, did not claim that her obesity was a functional limitation and "there was no medical evidence from which the ALJ could have concluded that [plaintiff's] obesity was a severe impairment."). Any such contention would also be inconsistent with the activities of daily living which Winston undisputedly performed:

> In activities of daily living, the claimant had mild restriction. The claimant was able to perform a variety of daily activities including watching television, going to church, working in the yard, playing with the grandchildren, and fishing.

(Tr. 17; *see also* Tr. 23 ("his wife testified that he played with their five grandchildren, drove, visited with others, and went fishing.")).

In addition, the first actual diagnosis of obesity by a physician was not made until April 3, 2008 (Tr. 514), when he was being admitted to "his third treatment program for substance dependence and he [was to be] treated for cocaine and alcohol dependence" (Tr. 515). This occurred one year after his insured status expired. Consequently, during the relevant time period, there was no medically determinable impairment of obesity. *See*, 20 C.F.R. § 404.1513 ("We need evidence from an acceptable medical sources to establish whether you have a medically determinable impairment(s)"). The evidence in this record does not demonstrate that obesity, either alone or in combination with any other impairment, limited Winston's ability prior to his last insured date of March 31, 2007. The ALJ, therefore, committed no error in denying his applications for benefits.

## CONCLUSION

For the reasons stated above, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be and is hereby **AFFIRMED**.

**DONE** this  19th  day of August, 2013.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**